IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 12, 2016

## STATE OF TENNESSEE v. CHRISTOPHER LYNN CLARK

**Appeal from the Circuit Court for Obion County**
**No. CC-2014-CR-09      Jeffrey W. Parham, Judge**
_____

**No. W2015-01579-CCA-R3-CD  -  Filed August 15, 2016**
_____


An Obion County jury convicted the Defendant, Christopher Lynn Clark, of one count of vehicular homicide by intoxication and four counts of vehicular assault with intoxication. The trial court ordered concurrent sentences for an effective sentence of ten years in the Department of Correction.   The Defendant appeals, claiming: (1) the evidence is insufficient to support his convictions; (2) the trial court invaded the province of the jury by commenting on the evidence in response to a juror question; and (3) his sentence is excessive.  After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Joseph P. Atnip, Dresden, Tennessee, for the appellant, Christopher Lynn Clark.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Thomas A. Thomas, District Attorney General; and James T. Cannon, Assistant District Attorney General, for the appellee, State of Tennessee.


## OPINION

This case involves a fatal car crash.  An Obion County grand jury indicted the Defendant for one count of vehicular homicide by intoxication, four counts of vehicular assault, one count of vehicular homicide by recklessness, and four counts of aggravated assault by recklessness.  The case proceeded to trial and the parties stipulated to the fact that the Defendant's blood was drawn and delivered to the Tennessee Bureau of Investigation ("TBI") laboratory for testing.

Larry Ennis testified that on August 30, 2013, he was driving a tractor and baler down Chapel Hill Road in Obion County. A service vehicle, driven by George McGowen, with caution lights to warn other drivers followed Mr. Ennis during the drive. As Mr. Ennis drove down Chapel Hill Road, he noticed a white Tahoe beside him passing on the left. He did not see it approach from the rear until it was next to him because the baler he was pulling blocked his view of rear approaching vehicles. As the Tahoe passed him, it hit the "up-rise" to a driveway along the road and lost control. Mr. Ennis said it appeared the driver of the Tahoe tried to straighten out the vehicle without slowing down but "never did gain control." Mr. Ennis could not estimate the speed of the Tahoe at the time but said that "speed [was] involved."

Mr. Ennis watched as the Tahoe fishtailed to the top of the hill and then veered off the road into "Mr. Warren's yard." The Tahoe proceeded up an embankment, flipped over, and hit a tree.

George McGowen testified that he was following Mr. Ennis down Chapel Hill Road when the crash occurred. Mr. McGowen first saw the Tahoe when it passed him at a high rate of speed to his left on the two-lane road. The Tahoe then clipped a culvert in a driveway and lost control. He described the Tahoe as "twisting and turning, flipping and flopping . . . back and forth." The Tahoe then left the roadway and flipped.

Kaitlyn Reason testified that the Defendant had been married to her mother "for a couple of years." Ms. Reason recalled that, on August 30, 2013, she planned to go to the funeral of her sister's boyfriend's mother. Ms. Reason and her sister, Breanna Clark, dressed for the funeral at Ms. Reason's residence where the Defendant picked up the sisters in his Tahoe. The Defendant was "in a rush" and asked Ms. Reason to drive. Ms. Reason drove to Chase Lyle's house, five minutes away, where Chase, Chance Lyle,[1] and Nathan Brandon joined them for the drive to the funeral. From there, Ms. Clark drove the Tahoe. As the group approached Chapel Hill Road, the Defendant "smacked" Ms. Clark in the back of her head and told her she was not driving fast enough. He then ordered Ms. Clark to stop the car so that he could drive. The other passengers suggested that Mr. Brandon drive, but the Defendant chose to drive.

Ms. Reason testified that the Defendant drove a normal speed initially but then "really fast" as he passed the tractor and baler. At one point she observed the speedometer at "at least 90." The other passengers told the Defendant to slow down but to no avail. Ms. Reason recalled passing the tractor and baler on Chapel Hill Road and

---

[1] Because Chase Lyle and Chance Lyle are related and share the same last name, for clarity, we refer to both by their first names.

then running off the road.  The Defendant "jerked the wheel, overcorrected," and then the Tahoe flipped over.  The Tahoe came to a stop in front of a tree in a residential yard.  Ms. Reason was seated in the back seat of the vehicle at the time of the crash and initially rendered unconscious.  When she regained consciousness, she could see that Ms. Clark and Mr. Brandon had been thrown from the vehicle.  Chase and Ms. Reason climbed out of the vehicle and began looking for the other passengers.  Chase found his brother Chance deceased.  The Defendant, who also exited the vehicle walked around the outside of the vehicle.  Ms. Reason stated that she had several scratches due to the accident, and she was transported by ambulance for treatment at a local hospital.

On cross-examination, Ms. Reason testified that, after leaving the Lyle residence, the group was going to the Defendant's father's house, five to ten miles away, to "pick up more seats."  She explained that she had not known that Chance and Mr. Brandon also needed a ride to the funeral, so there was not enough seating for everyone to have a seatbelt without retrieving the additional seating.

Nathan Brandon testified that he agreed to ride to the funeral in the Defendant's vehicle because his alternative plans for transportation had not worked out.  He said that when the group left the Lyle house in the Defendant's vehicle Ms. Clark was driving and the Defendant was seated in the front passenger seat.  At some point, the Defendant began cussing at Ms. Clark and "got rough" with her because she was not driving as fast as the Defendant preferred.  Ms. Clark pulled over at a church on Chapel Hill Road and switched places with the Defendant.  During this switch, Mr. Brandon and Chance attempted to exit the vehicle but "were stuck."  Mr. Brandon wanted to exit the vehicle because the Defendant was "clearly intoxicated."  Mr. Brandon described the Defendant as exhibiting slurred speech and glossy, dilated eyes.

Mr. Brandon testified that the Defendant "took off really fast" and continued to accelerate.  As the Tahoe passed a tractor to the left, the Tahoe "went off the road a little bit too much, jumped the culvert," slid into a yard, and flipped over.  Mr. Brandon felt his head hit the ceiling of the Tahoe before losing consciousness.  When he regained consciousness he was twenty feet from the Tahoe "looking up at the sky."  Mr. Brandon was unable to stand and was transported from the scene on a stretcher.  Mr. Brandon was transported to a local hospital and then airlifted to Vanderbilt hospital for treatment of his injuries.  Mr. Brandon's injuries included five fractured vertebrae, seven pelvic fractures, a cracked wrist, internal bleeding, and collapsed lungs.  He remained in a brace for eight weeks and, at the time of trial, still had limitations due to his injuries.

Chase Lyle testified that he was fifteen at the time of the crash as was his twin brother Chance.  Chase said that he had arranged for a different ride to the funeral but, when those plans fell through, he, Chance, and Mr. Brandon agreed to ride with Ms.

3

Clark, Ms. Reason, and the Defendant. Initially, Ms. Clark drove, but, as the Tahoe approached Chapel Hill Road, the Defendant "slapped" Ms. Clark on the back of the head and told her to pull the car over. The Defendant switched places with Ms. Clark and began driving the Tahoe at a high rate of speed. As the Defendant sped down Chapel Hill Road while passing a tractor, the Defendant "jumped the driveway," overcorrected, and the Tahoe left the road.

Chase regained consciousness while inside the vehicle and saw both Ms. Reason and the Defendant still inside the vehicle. All three climbed out of the vehicle, and Chase began to search for the others. Ms. Clark was located by a fence, Mr. Brandon was between the car and Ms. Clark, and Chance was behind the car. Upon seeing his brother, Chase knew his brother was deceased because he had been decapitated. Chase was treated at the hospital for a broken thumb and whiplash.

Jerry Mealer, a Tennessee Highway Patrol officer, testified that, on August 30, 2013, he was dispatched to a vehicle crash on Chapel Hill Road at 11:00 a.m. When he arrived he surveyed the scene and, after speaking with witnesses, requested the Critical Incident Response Team (CIRT) conduct further assessment of the crash scene. On cross-examination, Trooper Mealer agreed that he indicated on the Tennessee Electronic Traffic Crash Report that the Defendant's condition "appeared normal."

Paul Moore, a Tennessee Highway Patrol officer, testified as an expert witness in the field of accident reconstruction. Trooper Moore was assigned to the specialized unit CIRT to assist in the investigation of fatal crashes. He assisted in the investigation of this crash scene and described it as a "[v]ery violent crash." Trooper Moore identified photographs taken at the scene. One of the pictures showed the roadway with two solid yellow lines indicating a no passing zone. Based upon his investigation, Trooper Moore concluded that the Tahoe was traveling approximately 89.8 miles an hour and covered approximately 800 feet from the time the vehicle lost control until it came to a final stop.

Maureen Velez, a Tennessee Highway Patrol officer, testified as an expert witness in the field of accident reconstruction. Trooper Velez, also assigned to the specialized unit CIRT, analyzed the air bag control module recovered from the Defendant's vehicle. An air bag control module senses changes in a vehicle's velocity. This information can be taken from the module and used as part of a crash investigation. Trooper Velez received inconsistent speeds from the monitor, which she attributed to the car flipping over. Based on her assessment, she estimated that the vehicle was traveling at seventy-seven miles per hour as it traveled from the pavement to its final resting place.

Bethany McBride, a TBI forensic scientist, testified as an expert witness in the field of forensic science. Agent McBride tested the Defendant's blood for drugs and

4

found the presence of diazepam, nordiazepam, alprazolam, and tramadol. Diazepam, Nordiazepam, and alprazolam are benzodiazapines and are anti-anxiety medications or commonly prescribed as muscle relaxants. Tramadol is a pain reliever. Agent McBride testified that the equipment she used did not test for the presence of morphine or heroin.

Amanda Gray, a registered nurse employed by the Air Evac Life Team, testified that she participated in the Defendant's transport on August 30, 2013, to The Med in Memphis, Tennessee. As part of his medical assessment, the Defendant disclosed that his "current medications" were Percocet and Klonopin. During the flight to the hospital, the medical team administered morphine and Versed to the Defendant. The Defendant stated to Ms. Gray, several times during the flight, "I'm going to burn in hell for killing somebody else's kid."

On cross-examination, Ms. Gray agreed that on her report she indicated the Defendant was demonstrating signs of anxiety but also described him as "[a]wake, alert, oriented times three, full recall of event, and he was moving all extremities."

Gregory Davis, a forensic pathologist, testified as an expert witness in the fields of anatomic, clinical, and forensic pathology. Dr. Davis reviewed the medical records and reports associated with this incident and testified that the level of diazepam in the Defendant's blood sample was within therapeutic levels for a patient being treated for seizures but above the therapeutic range for patients being treated for anxiety. Dr. Davis stated that diazepam and alprazolam are often used to treat anxiety and decrease the central nervous system operation. He stated that diazepam could slow a person's reflexes and reaction time. He confirmed that generally physicians and pharmacists provide warnings about this drug when prescribed. The same is true for alprazolam, however, this drug is generally "shorter acting." Alprazolam was present in the Defendant's blood but at a low level. Dr. Davis said that it would be rare for a physician to prescribe two benzodiazapines, like alprazolam and diazepam, simultaneously because of the multiplicative effect.

Dr. Davis testified that tramadol is a synthetic narcotic generally prescribed as a pain reliever. This drug too has central nervous system depressant effects. The amount of tramadol found in the Defendant's blood was below the therapeutic range for this drug.

Based on Dr. Davis' review of the records and lab work, he opined that the Defendant, at the time of the accident, was under the influence of a combination of three different central nervous system depressants.

Dr. Davis was asked a juror-submitted question about the average time to metabolize each of the drugs he discussed. He estimated that the half-life for diazepam

5

was twenty-one to thirty-seven hours, for nordiazepam fifty or more hours, for alprazolam around thirteen hours, and for tramadol between four and a third to six and a half hours.

As part of the defense proof, Mark Fowler, a medical doctor, testified as an expert in the field of toxicology. Dr. Fowler stated that he had reviewed the relevant materials associated with this case and was concerned that the morphine and Versed administered to the Defendant during transport to the hospital were not found in his system. Based upon this, he suggested the entire test results were invalid. Dr. Fowler acknowledged that the drugs found in the Defendant's system can, "but don't always, impair . . . your ability to drive." Dr. Fowler then stated that, based upon the trial testimony, the TBI toxicology report, and Dr. Davis' report, he could conclude with "a reasonable degree of medical certainty that [the Defendant] was not impaired."

On cross-examination Dr. Fowler testified that "it is logical to substitute or switch samples in the lab or anywhere down the chain. And that is a reasonable explanation for why [the Defendant's blood] does not have either the Klonopin or the Percocet."

Following Dr. Fowler's testimony, a juror submitted the question, "How would the sample get mixed up and show the same medications?" The following conversation occurred between the parties during the bench conference:

Defense Counsel:       I'm not sure what the same medications are.

Court: I'm afraid to ask you that. I'm afraid to ask the one about shows the same medications. I mean, I don't know how the sample can get mixed up.

I'm going to instruct them right now that there's no proof that the sample --

The State:             Yes, sir.

Trial Court:           And that, that was covered by the stipulation.

Defense Counsel:       All right.

The trial court then advised the jury as follows:

The . . . question deals with a question about a mix-up of the sample, and I'm going to instruct the jury, there is no proof whatsoever that this sample was mixed up. Dr. Fowler has given his opinion that he thinks it's messed

6

up, but there's no proof in the record that it's mixed up. And, therefore, I'm going to instruct you that at this point there is no proof that it's mixed up.

The stipulation was the sample was drawn, . . . the chain of custody was kept intact until it got to the TBI lab. There is absolutely no proof that the TBI Lab mixed this sample up.

Brady McMillen, a retired Mississippi Highway Patrol officer, testified as an expert in the field of crash reconstruction. Mr. McMillen testified that he reviewed Trooper Moore's reconstruction report and "agreed with the numbers that he had," but disagreed with how Trooper Moore "arrived at his numbers." He stated that he was concerned that Trooper Moore did not provide the formulas he used to the jury and that Trooper Moore was unaware of the origin of the formula he used. Mr. McMillen estimated that the Defendant was driving between a minimum of seventy-four and seventy-six miles per hour based upon his investigation of the scene in October 2014, and his own calculations.

Based upon this evidence, the jury convicted the Defendant of vehicular homicide by intoxication and four counts of vehicular assault with intoxication. At a subsequent sentencing hearing, the trial court ordered the Defendant to serve ten years for the vehicular homicide conviction, a Class B felony, and three years for one of the vehicular assault convictions, a Class D felony. The trial court reduced the three other counts of vehicular assault with intoxication to reckless endangerment, a Class E felony, and imposed two-year sentences for each. The Defendant's total effective sentence is ten years in the Department of Correction. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant claims: (1) the evidence is insufficient to support his convictions; (2) the trial court invaded the province of the jury by commenting on the evidence in response to a juror question; and (3) his sentence is excessive.

## A. Sufficiency of the Evidence

The Defendant argues that the State failed to prove his intoxication and impairment while driving, therefore, his convictions should not stand. The State responds that sufficient evidence was presented to support the jury's finding of intoxication and impaired driving. We agree with the State.

When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), superseded by statute on other grounds as stated in *State v. Barone*, 852 S.W.2d 216, 218 (Tenn.1993)) (quotations omitted). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

For the purposes of this case, vehicular homicide by intoxication is the reckless killing of another by the operation of an automobile as the proximate result of the driver's intoxication. T.C.A. § 39-13-213(a)(2)(2015). A person "acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the results will occur." T.C.A. § 39-11-302(c)(2014). A person commits reckless endangerment when they recklessly engage "in conduct that places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103 (2015). Finally, vehicular assault by intoxication requires a showing that, as a proximate result of the defendant's intoxication, the Defendant recklessly caused serious bodily injury to another person by operating a motor vehicle. T.C.A. § 39-13-106(a)(2015).

The evidence, viewed in the light most favorable to the State, showed that the Defendant initially asked other passengers to drive his vehicle, but when he became dissatisfied with the slow speed, assumed control of the vehicle with the knowledge that not all of the passengers had access to seat belts. At that time, according to a passenger, the Defendant's speech was slurred and his eyes appeared glassy. The Defendant drove at a high rate of speed. As the Defendant passed, in a no passing zone, a tractor pulling a baler on a two-lane road, he clipped a culvert by a driveway and lost control of the vehicle. The vehicle flipped and landed in a residential yard upside down with at least two of the passengers being thrown from the vehicle in the process. One of the passengers, Chance Lyle, was thrown from the vehicle and decapitated. As a result of the crash, Mr. Brandon sustained five fractured vertebrae, seven pelvic fractures, a cracked wrist, internal bleeding and collapsed lungs. The other passengers sustained injuries requiring medical treatment, and the Defendant was airlifted to a hospital in Memphis. The Defendant admitted to taking Klonopin and Percocet and analysis of his blood showed the presence of diazepam, nordiazepam, alprazolam, and tramadol; all drugs that affect the central nervous system. Based upon this evidence, we conclude that a jury could find the Defendant guilty of vehicular homicide by intoxication, vehicular assault with intoxication, and reckless endangerment.

In his brief, the Defendant largely attacks the inconsistency in the State's witnesses' testimony as a basis for his insufficiency argument. As we earlier noted, the weight and credibility of the testimony of a witness and the reconciliation of conflicts in testimony, if any, are matters entrusted exclusively to the jury. By its verdict, the jury exercised its prerogative and chose to accredit the State's theory of the case. It is the jury who is charged with making credibility determinations, not this Court. *Smith*, 24 S.W.3d at 278. It is not the function of this Court to reweigh the credibility of witnesses on appeal. *Id*. at 278-79. The Defendant is not entitled to relief.

## B. Trial Court Comments on the Evidence

The Defendant asserts that the trial court improperly commented on the evidence when it instructed the jury that there was no evidence presented at trial that the Defendant's blood sample had been "mixed up." The State responds that this issue is waived because the Defendant failed to contemporaneously object at the time of the trial court's instruction. The State, however, maintains that the trial court's comments were proper.

The record reflects that the Defendant failed to contemporaneously object at trial and agreed to the trial court's instruction to the jury, thereby the Defendant "failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." Tenn. R. App. P. 36(a) (providing that "[n]othing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"); Tenn. R. Evid. 103(a)(1). Furthermore, the Defendant does not ask this Court to conduct a plain error review nor does he make any argument as to plain error review. It is the defendant's burden to persuade this Court that plain error exists and that the error "was of sufficient magnitude that it probably changed the outcome of the trial." *State v. Hester*, 324 S.W.3d 788, 808 (Tenn. 2010). Thus, we conclude that the Defendant waived our review of this issue and has not demonstrated that review is necessary to do substantial justice.

## C. Sentence

The Defendant asserts that the trial court erred when it sentenced him for two years more than the minimum length of sentence for the vehicular homicide conviction. The State responds that the sentence is in the appropriate range and in compliance with the purposes and principles of the Sentencing Act. We agree with the State.

Appellate review of sentences is under the abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (2012); *see also State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)).

To find an abuse of discretion, the record must be void of any substantial evidence that would support the trial court's decision. *Id.*; *State v. Grear*, 568 S.W.2d 285, 286 (Tenn. 1978); *State v. Delp*, 614 S.W.2d 395, 398 (Tenn. Crim. App. 1980). In the context of sentencing, as long as the trial court places the sentence within the appropriate range and properly applies the purposes and principles of the Sentencing Act, this Court must presume the sentence to be reasonable. *Bise*, 380 S.W.3d at 704-07. As the *Bise* Court stated, "[a] sentence should be upheld so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 708. We are also to recognize that the defendant bears "the burden of showing that the sentence is improper." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

In determining the proper sentence, the trial court must consider: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors set out in Tennessee Code Annotated sections 40-35-113 and -114; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and (7) any statement the defendant made in the defendant's own behalf about sentencing. *See* T.C.A. § 40-35-210 (2014); *State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001).

The trial court applied three enhancement factors: enhancement factor (3), the offense involved more than one victim; enhancement factor (6) the personal injuries inflicted upon or the amount of damage to property sustained by or taken from the victim was particularly great; and enhancement factor (8) the defendant before trial or sentencing failed to comply with the conditions of a sentence involving release in the community. T.C.A. § 40-35-114(3), (6), and (8). The Defendant asserts and the State concedes that the trial court erroneously applied these three enhancement factors in this case.

11

The misapplication of an enhancement or mitigating factor, however, does not remove the presumption of reasonableness from a trial court's sentencing decision. *Bise*, 380 S.W.3d 682, 706. A reviewing court should not invalidate a sentence on this basis unless the trial court wholly departed from the principles of the Sentencing Act. *Id.* at 707. So long as there are other reasons consistent with the purpose and principles of sentencing, a sentence within the appropriate range should be upheld. *Id.*

At the sentencing hearing, the trial court stated that, in determining the appropriate sentence, it had considered the evidence presented at trial and the sentencing hearing, the presentence report including the victim impact statements, the principles of sentencing, arguments of counsel, the nature and characteristics of the criminal conduct involved and mitigating and enhancement factors. The trial court noted that the Defendant had a pending charge for DUI that was acquired the Friday before his trial for these offenses. It further noted prior arrests and convictions for DUI, in addition to the pending offense. The trial court "heavily" considered the victim impact statements noting Mr. Brandon's statement: "I wake up in the middle of the night crying sometimes having anxiety attacks. I wake up every morning reliving the wreck."

At the motion for new trial hearing, the trial court maintained that the enhancement factors were applicable but also stated that enhancement and mitigating factors are "advisory only" and that the within range sentence was appropriate under the circumstances.

Our review of the record shows that the trial court properly imposed a sentence that was within range and consistent with the purposes and principles of sentencing. The Defendant has multiple arrests and convictions for driving-related and drug or alcohol-related offenses. He elected to drive a vehicle at a high rate of speed, knowing that not all of the occupants had seat belts and attempted to pass Mr. Ennis in a no passing zone. The Defendant acknowledged taking Klonopin and Percocet, and his blood analysis revealed the presence of drugs affecting the central nervous system. The Defendant placed the five other passengers in his vehicle in danger as well as Mr. Ennis and Mr. McGowen with whom he shared the roadway. The Defendant's actions resulted in the death of a fourteen-year-old boy and severe injury to Mr. Brandon. The Defendant expressed his remorse over the injuries caused to his passengers but was arrested for DUI on the Friday before the trial in this matter. We cannot conclude that the trial court abused its discretion in sentencing the Defendant to ten years of incarceration. The Defendant is not entitled to relief.

### III. Conclusion

In accordance with the aforementioned reasoning and authorities, we affirm the judgments of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE